

2008 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

4-14-2008

# United Steelworkers v. Rohm & Haas Co

Precedential or Non-Precedential: Precedential

Docket No. 06-4346

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2008

Recommended Citation

"United Steelworkers v. Rohm & Haas Co" (2008). *2008 Decisions.* Paper 1293.
http://digitalcommons.law.villanova.edu/thirdcircuit_2008/1293

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2008 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**PRECEDENTIAL**


UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT


No. 06-4346


UNITED STEELWORKERS OF AMERICA, AFL-CIO-
CLC, ET AL.,

Appellees,

v.

ROHM AND HAAS COMPANY and
ROHM AND HAAS HEALTH AND WELFARE PLAN,

Appellants.


On Appeal from the Judgment of the United States District
Court
for the Eastern District of Pennsylvania
(Civ. No. 05-0039)
District Judge: Honorable J. Curtis Joyner

Argued: February 4, 2008

Before: McKEE, AMBRO, *Circuit Judges*, and IRENAS,[*]
*Senior District Judge*.

(Filed April 14, 2008 )

Raymond A. Kresge, Esq. (Argued)
Cozen O'Connor
1900 Market Street
Philadelphia, PA 19103

Counsel for Appellants


William Payne, Esq. (Argued)
Stember, Feinstein, Doyle & Payne
1007 Mt. Royal Blvd.
Pittsburgh, PA 15223

Pamina Ewing, Esq.
Stember, Feinstein, Doyle & Payne
1705 Allegheny Building
429 Forbes Avenue
Pittsburgh, PA 15219

---

[*] Honorable Joseph E. Irenas, Senior United States District Judge for the District of New Jersey, sitting by designation.

Counsel for Appellees

_____

OPINION

_____

IRENAS, Senior United States District Judge.

In this case we are asked to review a determination by the District Court that an employee's challenge to a denial of disability benefits under a plan adopted by an employer pursuant to the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq*., is subject to the grievance procedure, including arbitration, contained in a separate collective bargaining agreement (the "CBA") negotiated between the employer and its workers under the National Labor Relations Act, 29 U.S.C. § 151 *et seq*. While we recognize the strong policy considerations favoring arbitration of labor disputes, there is no right to arbitration of ERISA benefits under a CBA

unless the ERISA benefits sought are either: (i) derived directly from an ERISA plan established and maintained by or incorporated into a CBA whose grievance procedure contains an arbitration clause, or (ii) created by a separate ERISA plan and that plan and/or the CBA provide that adverse benefit determinations by a plan administrator are subject to the CBA's grievance procedure that includes arbitration. Because we hold that the benefits sought in this case are neither created by or incorporated into the CBA nor made subject to the CBA's grievance procedure, we reverse the District Court's order granting summary judgment to the union and those workers seeking disability benefits and denying summary judgment to the employer. We remand for further proceedings on the remaining claim consistent with this opinion.

I.

Plaintiffs-Appellees United Steelworkers of America, AFL-CIO-CLC (the "Union"), Lewis Griffin, George Hemmert, George Keddie, and Janice Scott (the "Individual Plaintiffs"), filed a two count complaint in the Eastern District of Pennsylvania against Defendants-Appellants Rohm and Haas Company (the "Company") and Rohm and Haas Company Health and Welfare Plan (the "Plan"). The Individual Plaintiffs are employees at the Company's Bristol, Pennsylvania facility and members of the Union, which represents the hourly production and mechanical employees at this facility. Count I of the Complaint sought to compel arbitration of four grievances filed by the Individual Plaintiffs to challenge the denial of disability benefits under the Plan, pursuant to the CBA between the Company and the Union covering the Bristol facility (the

"Bristol CBA").[1] Count II, in the alternative, alleged violations of Section 502 of ERISA, 29 U.S.C. § 1132 (a)(1)(B) and (a)(3). At the inception of the case, the District Court ordered that the two counts be litigated separately and that discovery proceed initially on Count I only. Upon the filing of the parties' cross-motions for summary judgment as to Count I only, the District Court granted the Plaintiffs' motion for summary judgment and denied the Defendants' motion for summary judgment, thus disposing of the case and rendering Count II of the Complaint moot. The Company and the Plan now appeal the District Court's decision in its entirety.

A.

---

[1]Subject matter jurisdiction on Count I is premised on Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185.

Each of the four Individual Plaintiffs sought to obtain either disability retirement or long term disability benefits from the Plan, and these benefits were denied by the Plan administrator.  Following these denials, the Union submitted grievances pursuant to the Bristol CBA on behalf of the four Individual Plaintiffs, to which the Company failed to respond. The grievances of the four Individual Plaintiffs were filed between August 27, 2003 and October 8, 2004.  The Union contends that each of the Individual Plaintiffs fully exhausted the grievance procedures or that any additional attempts to exhaust such procedures would have been futile.  The Union demanded that these grievances be arbitrated in accordance with the Bristol CBA; however, the Company refused to arbitrate these grievances, arguing that any challenge to a denial of benefits under the Plan had to be made pursuant to the appeal procedure contained in the Plan itself.

On January 6, 2003, prior to the filing of the grievances on behalf of the four Individual Plaintiffs, the Union filed a site-wide grievance pursuant to the Bristol CBA (the "Site-Wide Grievance") complaining that the "disability case management process" resulted in the termination or denial of disability benefits in a manner inconsistent with the Plan.[2] The Company has never responded to the Site-Wide Grievance, and the Union has never demanded arbitration of this grievance.

---

[2]The Site-Wide Grievance states:

The Union is grieving the disability case management process. Liberty Mutual and Rohm and Haas have been engaged in a process that is clearly arbitrary and inconsistent with the provisions of the disability benefits program. Liberty Mutual and Rohm and Haas have denied disability benefits and terminated disability benefits without cause and in a manner inconsistent with the plan provisions. The Union wants to be made whole. Made whole includes, but is not limited [sic], administration of the plan as stipulated in the benefits [Summary Plan Description] dated June 1994, all current and past bargaining unit members to be made whole for all moneys and benefits lost, in addition to reimbursement for all costs resulting from the processing of any and all appeals of disability benefits denials.

8

B.

"Article II - Recognition" of the Bristol CBA, effective May 8, 2000 to May 7, 2004,[3] provides that "[t]he provisions of this Agreement hereafter pertain only to the wages, hours, and working conditions of the . . . employees." Article V then establishes a five-step grievance procedure covering "[s]uch questions arising under this Agreement as involve wages (other than general adjustments), individual base rates, hours of employment and working conditions which any employee may desire to discuss with the Company." The final step of the

---

[3]Although the production unit and the mechanical unit maintained separate collective bargaining agreements, the terms in the collective bargaining agreements relevant to this action are identical and are thus analyzed as if they were one agreement.

grievance procedure states: "Should agreement not be reached [during the previous steps] . . . then either party may submit the matter to arbitration as described in Article VI."

Article VI on Arbitration provides that "[t]he sole responsibility of said arbitrator shall be to interpret the meaning of the Articles of this contract, and it in no way shall be construed that the arbitrator shall have the power to add to, subtract from, or modify in any way the terms of this Agreement."

The Bristol CBA also contains an Article addressing the medical examinations of Union members:

**ARTICLE XIX - MEDICAL EXAMINATIONS**

1.   All new employees must pass a Company medical examination.

2. Company medical examinations of employees or groups of employees shall be made from time to time.  Should any examination disclose that a transfer to another department would be beneficial from a health standpoint, the employee will

10

be consulted and the transfer considered. A transfer for this reason shall be with the concurrence of the Company and the Union and shall not be held in violation of the seniority provisions. Such exceptions are subject to periodic medical examinations.

3. Before any employee's status is changed due to physical incapacity, he shall be entitled to a medical examination by an impartial physician should there be disagreement between the Company physician and the employee's personal physician. When the Company physician and the employee's personal physician disagree, and prior to the receipt of an impartial physician's opinion, the employee will be placed on disability absence and be provided benefits under the provisions of the Sickness and Accident plan, provided no suitable reassignment is available. It shall be the Company's and the Union's goal to have such situations resolved as soon as possible.

4. When an employee feels he needs a medical examination, he will receive same upon a written request to the Labor Relations Manager. An employee's physician may obtain from the Plant physician a written statement of medical findings.

5. Should it be determined by a medical examination that an employee is no longer able to do his regular work, then this employee shall be eligible for such other regular work that may be available and which he can perform satisfactorily. It in no way is understood that the Company must provide such work. Said employee shall receive the rate of the job to which he is transferred but may be eligible for wage rate protection as provided for under the provisions of the Disability Rate

Protection Policy.[4]

With the exception of the mention of the "Sickness and Accident plan" in Article XIX (3), the Bristol CBA does not contain any other reference to disability benefits.

The Plan, as amended and restated effective January 1, 2003, provides for disability income benefits[5] and other benefits for eligible employees of the Company, including non-union employees, and is not limited to Company locations covered by the Bristol CBA.  The Plan is governed by ERISA and exists

---

[4]While the parties have not explained the term "Disability Rate Protection Policy," it does not appear to be a "disability benefit" provided under the Plan.

[5]"Disability Benefit" is defined as "a benefit provided under a Benefits Program (including, but not limited to, benefits provided by the Long-Term Disability Program) as a result of the disability of a Claimant.  The terms and provisions, and conditions of eligibility thereto, are set forth in the Applicable Contract and Summary Plan Description for such benefit."

outside of and is independent from the Bristol CBA. The Union is not a signatory to the Plan, and there is no reference to the Bristol CBA or the Union throughout the Plan.

The Plan vests the Rohm and Haas Benefits Administrative Committee with "the sole discretion to interpret the Plan and decide any matters arising hereunder" and states that "[a]ny final determination by the Rohm and Haas Benefits Administrative Committee shall be binding on all parties." Final determinations by the Rohm and Haas Benefits Administrative Committee "shall not be subject to de novo review and shall not be overturned unless proven to be arbitrary and capricious . . . ."

The Plan establishes a detailed claims procedure by which an employee may seek to claim benefits and to appeal a denial of benefits. The claims procedure provides:

Any claim for Benefits under any of the Benefit Programs shall be made in accordance with the procedures as set

forth in the Applicable Contracts[6] or Summary Plan Description and in accordance with the procedure set forth below. Should there be a conflict between the procedures set forth in any Applicable Contract or Summary Plan Description and the procedures set forth below, the procedures set forth below shall control.

Pursuant to the claims procedure, a claimant seeking benefits under the Plan initially files a claim with the Claims Administrator. If a claimant receives an adverse benefit determination, he may then file an appeal with the Appeals Administrator, who is vested with final determination of adverse disability claims. The Plan requires the final notice of an adverse benefit determination to include "a statement of the Claimant's right to bring an action under section 502(a) [29

---

[6]An "Applicable Contract" is defined as "any contract, agreement or other similar document pursuant to which Benefits are provided under a Benefit program. The terms of any such Applicable Contract, as in effect from time to time, are hereby incorporated into the Plan and each applicable Benefit Program."

U.S.C. § 1132(a)] of ERISA . . . ."  The Plan further provides that any claimant seeking to file a lawsuit must do so within ninety days of receipt of the adverse benefit determination or the commencement of the action will be barred.  The Plan does not provide for arbitration at any step of the claims procedure.

C.

Upon examining these documents, the District Court found that the relevant provisions created an ambiguity as to whether the Individual Plaintiffs' grievances were subject to arbitration under the Bristol CBA.  The District Court then looked to the summaries of the collective bargaining negotiations for evidence of the parties' intent, and found that, because disability benefits were the subject of negotiations between the Union and the Company over the past forty years, such benefits were encompassed under the agreement as

15

"wages" and "working conditions." Despite the fact that the Bristol CBA did not reference the Plan or provide any details regarding disability benefits, the District Court held that sufficient extrinsic evidence existed to show that the parties intended to incorporate the Plan into the Bristol CBA.

## II.

Our Court has plenary review over the District Court's order granting summary judgment as a matter of law.[7] *Local*

---

[7]The Plaintiffs argue that, to the extent that this Court is reviewing the District Court's factual determination of the parties' intent to arbitrate, the standard of review is clearly erroneous. *See Lukens Steel Co. v. United Steelworkers*, 989 F.2d 668, 672 (3d Cir. 1993) ("The proper standard of review has to be whether the district court's findings - interpretation of the contract, that is, the intent of the parties as to the meaning of the contract's language - are clearly erroneous." (quoting *John F. Harkins Co. v. Waldinger Corp.*, 796 F.2d 657, 660 (3d Cir. 1990))). Because we do not find the

16

*827, Int'l Bhd. of Elec. Workers v. Verizon N.J., Inc.*, 458 F.3d

305, 309 (3d Cir. 2006) [hereinafter *Verizon*]; *see also Harris v.*

*Green Tea Financial Corp.*, 183 F.3d 173, 176 (3d Cir. 1999)

(holding standard of review is plenary where appeal "presents

a legal question concerning the applicability and scope of an

arbitration agreement").

 We first recognize the strong federal policies that favor

arbitration of labor disputes, which are largely premised upon

the "arbitrator's superior expertise in the mechanics of collective

relevant documents ambiguous with respect to the issues
before us, it is not necessary to consider the District Court's
factual findings with respect to the parties' intent. *See, e.g.*,
*Reliance Ins. Co. v. Colonial Penn Franklin Ins. Co. (In re*
*Montgomery Ward & Co.),* 428 F.3d 154, 165 (3d Cir. 2005)
(holding that the lower courts erred in reviewing extrinsic
evidence of the parties' intent where the contract was not
ambiguous). *See also Teamsters Indus. Employees Welfare*
*Fund v. Rolls-Royce Motor Cars, Inc.*, 989 F.2d 132, 135 (3d
Cir. 1993) ("The determination of whether a contract term is
clear or ambiguous is a pure question of law requiring plenary
review.").

bargaining and collective bargaining agreements, greater understanding of the law of the shop, and greater efficiency in resolving labor disputes." *Laborers' Int'l Union v. Foster Wheeler Corp.*, 26 F.3d 375, 399 (3d Cir. 1994). The key principles governing whether a dispute is arbitrable are well established:

First, "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." Second, "in deciding whether the parties have agreed to submit a particular grievance to arbitration, a court is not to rule on the potential merits of the underlying claims." Third, "where the contract contains an arbitration clause, there is a presumption of arbitrability in the sense that, 'an order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage.'"

*Lukens Steel Co. v. United Steelworkers*, 989 F.2d 668, 672-73 (3d Cir. 1993) (quoting *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648 (1986)) (internal citations

omitted). Where parties have agreed to submit all questions of the interpretation of a collective bargaining agreement to an arbitrator, the court "is confined to ascertaining whether the party seeking arbitration is making a claim which on its face is governed by the contract." *United Steelworkers v. American Mfg. Co.*, 363 U.S. 564, 567-58 (1960). Our Circuit has articulated three questions to consider when assessing whether a dispute is arbitrable: "(1) Does the present dispute come within the scope of the arbitration clause?[;] (2) does any other provision of the contract expressly exclude this kind of dispute from arbitration?[;] and (3) is there any other 'forceful evidence' indicating that the parties intended such an exclusion?" *E.M. Diagnostic Sys., Inc. v. Local 169, Int'l Bhd. of Teamsters*, 812 F.2d 91, 95 (3d Cir. 1987).

A.

The parties devote much of their briefing to the issue of whether the arbitration clause is narrow or broad, and consequently whether the presumption of arbitrability arises. Relying on *Verizon* and *Trap Rock Industries, Inc. v. Local 825, International Union of Operating Engineers*, 982 F.2d 884 (3d Cir. 1992) [hereinafter "*Trap Rock*"], the Company and the Plan argue that the presumption of arbitrability only applies where the arbitration clause is broad, and thus does not apply where the arbitration clause is narrow.

Cases holding that the arbitration clauses at issue are narrow have generally relied on language expressly limiting the scope of the clause to specific subject matter. For example, because the arbitration clause in *Verizon* specifically enumerated certain articles within the collective bargaining agreement that were subject to arbitration, the court held that the arbitration

provision was narrow as it "clearly forecloses the possibility that other issues could be arbitrated by providing that the list is exclusive." 458 F.3d at 307, 311-12. Likewise, the *Trap Rock* court held that an arbitration clause was narrow where the employer reserved its right to determine its employees' qualifications and discharge or demote its employees based on such qualifications and also expressly excluded the right of the arbitrator to make such determinations. *Trap Rock*, 982 F.2d at 888.

We do not believe that the arbitration clause here explicitly forecloses the range of arbitrable subject matter. Although the arbitration clause limits the arbitrator's power to interpreting the articles of the Bristol CBA, such a limitation on power is not an exclusion from arbitration of subject matter that is addressed in the Bristol CBA. Further, while the terms of the Bristol CBA and its grievance procedure apply to wages, hours,

21

and working conditions, such terms are themselves fairly expansive and encompass a variety of types of claims within their definitions. Read in its entirety, the Bristol CBA neither specifically excludes nor provides evidence of a purpose or intent to exclude categories of grievances from arbitration.

As such, the arbitration clause here is more akin to those arbitration clauses held to be broad. *See, e.g.*, *Lukens Steel*, 989 F.2d at 673 (3d Cir. 1992) (holding that an arbitration provision was broad where it called for arbitration "[s]hould any differences arise as to the meaning and application of, or compliance with, the provisions of this Agreement" and further noting that the parties' express exclusion of other categories of subject matter from the arbitration clause indicated that the parties knew how to limit the categories of arbitrable subject matter); *E.M. Diagnostic Sys., Inc.*, 812 F.2d at 92 (clause was broad where it called for arbitration of "any dispute arising out

22

of a claimed violation of this Agreement"). Because there is neither an express provision excluding issues concerning disability benefits from arbitration nor forceful evidence of a purpose to exclude such benefits from the Bristol CBA's grievance procedure, we hold that the arbitration clause is broad and thus the presumption of arbitrability applies.

B.

Regardless of whether the arbitration clause is broad or narrow, however, arbitration is still a creature of contract and a court cannot call for arbitration of matters outside of the scope of the arbitration clause. *See AT&T Techs., Inc.*, 475 U.S. at 656 ("'[W]hether or not the company was bound to arbitrate, as well as what issues it must arbitrate, is a matter to be determined by the Court on the basis of the contract entered into by the

23

parties.'" (quoting *John Wiley & Sons, Inc. v. Livingston*, 376 U.S. 543, 547 (1964))); *E.M. Diagnostic Sys., Inc.*, 812 F.2d at 94-95.

Here, the scope of the Bristol CBA's grievance procedure is limited to "[s]uch questions arising under this Agreement as involve wages (other than general adjustments), individual base rates, hours of employment and working conditions which any employee may desire to discuss with the Company shall be subject to adjustment." Although we hold that the Bristol CBA's arbitration clause is broad, the underlying basis for the grievance submitted through the Bristol CBA grievance procedure must still arise from some specific article of the Bristol CBA. The Bristol CBA does not, however, have an article devoted to disability benefits nor does it provide any sort of discussion as to the employees' rights to or calculations regarding such benefits. Because there is no specific language

addressing the employees' rights to disability benefits, we cannot say that such benefits were provided for under the terms of the Bristol CBA.

The Union and the Individual Plaintiffs present two possible arguments for their claim that disability benefits may be the subject of the grievance procedure and thus arbitrable. First, the Union and the Individual Plaintiffs contend that disability benefits are considered "working conditions" and are thus included within the range of arbitrable subject matter. In support of this argument, the Union and the Individual Plaintiffs cite to cases that interpret "wages" and "conditions of employment" as used in the National Labor Relations Act[8]

---

[8]*See* 29 U.S.C. § 159 (a) ("Representatives designated or selected for the purposes of collective bargaining . . . shall be the exclusive representatives of all the employees in such unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment."); *Id*. § 158 (d) (mandatory subjects of

25

("NLRA") as encompassing employee benefits. *See NLRB v. Katz*, 369 U.S. 736, 744 (1962) (sick leave benefits are considered a "condition of employment"); *W.W. Cross & Co. v. NLRB*, 174 F.2d 875, 878 (1st Cir. 1949) (finding that the term "wages" encompasses a group insurance program); *In re Inland Steel*, 77 N.L.R.B. 1, 4-5 (1948) ("[T]erm 'wages' as used in Section 9(a) must be construed to include emoluments of value, like pension and insurance benefits, which may accrue to employees out of their employment relationship.").

These cases are distinguishable, as the phrase "working conditions" is distinct from the phrase "conditions of employment." *See In re Inland Steel*, 77 N.L.R.B. at 11-12 (stating that the phrase "conditions of employment" is intended

---

collective bargaining include "wages, hours, and other terms and conditions of employment"); *Id.* § 152 (9) (defining the term "labor dispute" to include any controversy regarding "terms, tenure or conditions of employment").

to have a broader meaning than "working conditions" as shown in the NLRA's legislative history).   In the context of the Equal Pay Act, 29 U.S.C. § 206(d)(1), the phrase "working conditions" has been defined as the physical surroundings of and hazards to a worker. *See, e.g.*, *Corning Glass Works v. Brennan*, 417 U.S. 188, 201-03 (1974) ("[T]he element of working conditions encompasses two subfactors: 'surroundings' and 'hazards.' 'Surroundings' measures the elements, such as toxic chemicals or fumes, regularly encountered by a worker, their intensity, and their frequency. 'Hazards' takes into account the physical hazards regularly encountered, their frequency, and the severity of injury they can cause. This definition of 'working conditions' is . . . well accepted across a wide range of American industry."); *Hodgson v. Corning Glass Works*, 474 F.2d 226, 231-232 (2d Cir. 1973) (relying on the Department of Labor's definition of "working conditions" as encompassing the physical

environment of a worker, the court held that shift differentials were not "working conditions"). Further, even if we were to find that the phrase "condition of employment" was synonymous with "working conditions," the employees' rights to disability benefits were simply not memorialized within the final terms of the Bristol CBA. If, for example, the Union seeks to complain that the Company failed to bargain over disability benefits in violation of their mandatory subjects of bargaining, then the proper procedural route would be to file an unfair labor practice with the National Labor Relations Board.

We join with the courts that have defined "working conditions" as encompassing the physical surroundings of a worker at the place of employment. Thus, under the Bristol CBA, the terms "working conditions" and "wages" do not encompass disability benefits. *See also So. Ry. Co. v. Occupational Safety & Health Review Comm'n*, 539 F.2d 335,

28

339 (4th Cir. 1976) (finding that, under Section 4(b)(1) of the Occupational Safety and Health Act of 1974, "working conditions" "mean[] the environmental area in which an employee customarily goes about his daily tasks").[9]

Second, the Union and the Individual Plaintiffs argue that disability benefits are generally provided for under the Bristol CBA, and thus, disagreements over such benefits should be submitted through the Bristol CBA grievance procedure. In making this argument, the Union and the Individual Plaintiffs rely on the language from the Bristol CBA providing that where

---

[9]We recognize that the parties could have explicitly defined the phrase "working conditions" to encompass a broader meaning than that contemplated in these statutes. As the parties did not provide any definition of "working conditions" in the Bristol CBA, we believe that the cases interpreting "working conditions" under the Equal Pay Act and Occupational Health and Safety Act are instructive, as they provide the definition as understood across the labor industry.

a grievance "involve[s] the interpretation of the contract, then either party may submit the matter to arbitration," and providing that the grievance procedure applies to "questions arising out of this Agreement."

The Union and the Individual Plaintiffs argue that the sole reference to the "Sickness and Accident plan" provides proof that the benefits were provided pursuant to the Bristol CBA. However, when reading Article XIX(3) regarding Medical Examinations in its entirety, the article contemplates a situation where an employee seeks to continue working in spite of a potential disability. The article states that an "employee *shall be entitled* to a medical examination" and that the employee may receive benefits under the "Sickness and Accident plan" only when "no suitable reassignment is available." The situation contemplated is thus the reverse of that of the Individual Plaintiffs, who seek to extend their right to

30

receive disability benefits.[10]  Further, the mere reference to the "Sickness and Accident plan" without more does not incorporate the entire Plan into the Bristol CBA.  *See RCA Corp. v. Local 241, Int'l Fed'n of Prof'l and Technical Eng'rs*, 700 F.2d 921, 927 (3d Cir. 1983) ("[M]ere mentioning of the Retirement Plan in the General Agreement is insufficient reason to construe the Retirement Plan as part and parcel of the General Agreement."). We do not find any ambiguity in the Bristol CBA that would permit it to be reasonably interpreted to provide for disability

---

[10]  The Union and the Individual Plaintiffs have produced summaries of previous negotiations from which they argue that disability benefits, or at least Accident and Sickness benefits, were the subject of collective bargaining between the Union and Company since 1966.  Because the contractual language is not ambiguous, we do not think it necessary to examine extrinsic evidence to ascertain the parties' intent. Even were we to consider the negotiating history, we are still left with a Bristol CBA that simply contains no provisions defining the nature or extent of disability benefits, either directly or by reference to an extrinsic document.

benefits or to provide for arbitrating a plan administrator's denial of such benefits arising from a separate ERISA plan.

C.

The employees' right to receive disability benefits instead derives from the Plan, which sets forth detailed information concerning the qualifications for disability benefits, the types of benefits offered, and the calculations for determining the amount of benefits available. Pursuant to ERISA regulations, the Plan provides its own separate claims procedure and manner of appealing such decisions. *See* 29 U.S.C. § 1133; 29 C.F.R. § 2560.503-1 (2008).

Because the Plan provides the basis for the employees' right to receive disability benefits, these rights cannot be said to result from any agreement entered into between the Union and

32

the Company. This conclusion is further bolstered by the fact that the Company unilaterally changed the Plan on December 19, 2002, to be effective on January 1, 2003. The Company instituted these changes to the Plan during the period of the applicable Bristol CBA (which was in effect from May 8, 2000 to May 7, 2004). Additionally, the Plan offers benefits that apply to Rohm and Haas workers other than those governed by the Bristol CBA – a further indicator that disability benefits were not the fruit of collective bargaining.

We do not purport to hold that benefits provided pursuant to ERISA can never be subject to the grievance or arbitration provision contained within a CBA. Indeed, the regulations governing ERISA specifically contemplate that an ERISA plan may be established or maintained pursuant to a CBA and set forth separate guidelines for such plans. 29 C.F.R. § 2560.503-1 (2008). Here, because the Plan does not reference the Bristol

CBA, or vice versa, we conclude that there is no evidence that the ERISA plan was established or maintained pursuant to the Bristol CBA. As such, the benefits have been provided for under the Plan and initial claims or appeals over the denial of benefits must be submitted through the Plan's procedure, which does not provide for arbitration.

As evidence that the Company has previously arbitrated issues over disability benefits, the Union and the Individual Plaintiffs refer the court to an arbitration over the denial of disability benefits that took place in Houston between Rohm & Haas Texas, Inc. and a local of the Paper Allied-Industrial, Chemical and Energy Workers International Union, dated May 5, 2005. However, a reading of the arbitrator's decision makes clear that the matter was arbitrated pursuant to a provision contained in the ERISA plan itself, not pursuant to a grievance

34

procedure established by the CBA.[11]  As noted by the Arbitrator:

---

[11]  ERISA provides in 29 U.S.C. § 1133(2) that every employee benefit plan shall "afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim." Several courts have upheld the inclusion of an arbitration clause in an ERISA plan as part of the review process.  *See, e.g.*, *Chappel v. Lab. Corp. of Am.*, 232 F.3d 719, 724 (9th Cir. 2000) ("Thus, if the plan contains an arbitration clause, the plaintiff must arbitrate the dispute in accordance with the clause in order to exhaust his administrative remedies before filing suit in federal court."); *Seborowski v. Pittsburgh Press Co.*, 188 F.3d 163, 169-70 (3d Cir. 1999) (holding that arbitration was appropriate where the ERISA plan incorporated by reference terms of a supplemental CBA, which included an arbitration clause); *Peruvian Connection, Ltd. v. Christian*, 977 F. Supp. 1107, 1111 (D. Kan. 1997).

For example, in *United Steelworkers of America v. Retirement Income Plan for Hourly-Rated Employees of Asarco*, the Union sought to compel arbitration of "70/80" benefits provided under an ERISA plan.  512 F.3d 555, 558-59 (9th Cir. 2008).  The determination of whether the claimants were entitled to receive such benefits depended on a calculation of the number of years of "Continuous Service" served by each of the claimants.  *Id*. at 558.  The ERISA plan specified that issues concerning contract interpretation be subject to the plan's own internal claims procedure, but also provided for arbitration of disputes related to the number of

35

> This is a case about the interpretation of an employee benefit plan. The Collective Bargaining Agreement is silent as to employee benefits and the administration thereof. In fact, all language regarding employee benefits is contained in the Company's plan documents. As a result, this case involves the interpretation and administration of these documents. This arbitration is governed by [ERISA] . . . .

Thus, the ERISA plan covering the Rohm & Haas Texas, Inc. site is unlike the Plan in this case. The Texas ERISA plan specifically calls for arbitration if the claimant is unhappy with the results of the claims procedure, whereas the Plan at issue here does not.

---

years of "Continuous Service." *Id*. at 561. The ERISA plan also appears to provide a general arbitration clause calling for arbitration of disputes that "arise between any Employee . . . and the Company." *Id*. at 562. Applying the presumption of arbitrability, the court held that the ERISA plan could reasonably be interpreted to call for arbitration of such claims and thus ordered arbitration of them. *Id*. at 561. Here, the Plan does not call for arbitration as a means of determining rights to benefits, and thus, a right to arbitrate the claims of the Individuals Plaintiffs cannot derive from the Plan.

III.

For the foregoing reasons, we conclude that the District Court erred in holding that the claim of the Individual Plaintiffs concerning the denial of disability benefits is subject to the Bristol CBA's grievance procedures. We reverse the District Court's grant of summary judgment to the Union and the Individual Plaintiffs and remand with instructions that summary judgment be entered for the Company and the Plan and for further proceedings on Count II.