# U.S. COURT OF APPEALS FOR THE THIRD CIRCUIT

No. 25-1066

INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS,
LOCAL UNION 29, AFL-CIO

v.

ENERGY HARBOR NUCLEAR CORP.,
Appellant

_____

Appeal from the U.S. District Court, W.D. Pa.
Judge Cathy Bissoon, No. 2:23-cv-00761

Before: BIBAS, SCIRICA, and SMITH, *Circuit Judges*
Argued Oct. 29, 2025; Decided Mar. 23, 2026

_____

OPINION OF THE COURT

BIBAS, *Circuit Judge.* Even if parties agree to arbitrate some disputes, not every disagreement must go to an arbitrator. We must heed the scope of their arbitration agreement. Here, a labor union filed a grievance against management. The contract contains a broad arbitration clause, so the District Court sent the grievance to arbitration. But because it falls beyond the clause's scope, we will REVERSE.

## I. TWO DISPUTES OVER EMPLOYEE BENEFITS

### A. Energy Harbor and the Union arbitrate a 2021 benefits dispute

Energy Harbor Nuclear Corporation owned and operated the Beaver Valley Power Station, a nuclear power plant in Pennsylvania. IBEW Local 29 is the union that represents roughly 400 of the plant's employees. Before October 2021, the parties' relationship was governed by both a collective-bargaining agreement and a set of framework agreements that led Energy Harbor to operate the plant.

In 2021, the parties had a benefits dispute, so they went to arbitration. Under the then-existing collective-bargaining agreement, the Union could either choose Energy Harbor's Flexible Benefits Plan or offer its own health care plan. If the Union chose its own, Energy Harbor had to "contribute premium payments" to the Union's plan that were proportional to the premiums that it paid for its own plan. App. 82. And the collective bargaining agreement mandated that Energy Harbor's "monthly contributions [to the Union plan] … be increased by the same percentage as any increase incurred by [Energy Harbor's] Health Care Plan from the previous year." App. 83.

Under the framework agreements, Energy Harbor also had to "provide [employees] the same [healthcare] benefits" that its predecessor company did. App. 206 (second alteration in the original). The Union alleged that Energy Harbor had violated these agreements by providing worse benefits than its predecessor. In February 2022, the arbitrator agreed. She found that, under the matching requirement, Energy Harbor should have raised its 2021 contributions by 6.7% rather than the 2.77%

2

increase that it actually paid, and ordered the company to pay the unions the difference. She said nothing about 2022, and nothing in the order changed Energy Harbor's health care plan.

### B. The parties execute a new agreement, and a new dispute arises for 2022

On October 1, 2021, Energy Harbor and the Union signed a new collective-bargaining agreement. Three provisions are relevant. *First*, as before, if the Union chose to offer its own health care plan, Energy Harbor had to contribute premiums to it. And it again had to "increase[ ]" its contribution to the Union plan "by the same percentage as any increase incurred by the Company's Health Care Plan from the previous year." App. 83 (Art. VIII, ¶C.2(a)). *Second*, the parties agreed to arbitrate disputes "as to the interpretation, application, or operation of any provision of" the collective-bargaining agreement, as well as "any matter relating to the interpretation of" the agreement. App. 86. *Third*, under the merger clause, "any and all prior agreements, whether reduced to writing or not," were "null and void and of no further force" unless identified and appended to the new collective-bargaining agreement. App. 89 (Art. XI). Neither the February 2022 arbitration award, which assessed Energy Harbor's 2021 contributions, nor the framework agreements were identified or appended to the new agreement.

Later in 2022, the Union thought that Energy Harbor was still underpaying the contributions it owed the Union health care plan. So the Union filed a grievance, alleging that "Energy Harbor failed to adjust the 2022 health care contributions by the percentage needed to satisfy the [February 2022] arbitration award." App. 137. The Union argued that, in setting its

3

2022 contribution amounts, Energy Harbor had failed to account for the 2021 benefits-payments increases awarded by the arbitrator. In turn, the Union contended, the Company owed higher contributions for 2022. Energy Harbor refused to arbitrate, asserting that the grievance related to the arbitration award and the framework agreements, not the new collective-bargaining agreement, so the new agreement's arbitration clause did not apply.

Then the Union filed this suit in federal district court to compel Energy Harbor to arbitrate. Both sides moved for summary judgment. The magistrate judge recommended granting the Union's motion and denying Energy Harbor's. She noted that the "broad" arbitration clause "provides that a party may compel arbitration 'of any matter relating to the interpretation of this Agreement.'" App. 9, 11 (quoting Art. IX, ¶A). She set aside Energy Harbor's "extrinsic evidence … related to the reason for the Union's demanded increase" because it "goes to the merits," not arbitrability. App. 10. Instead, she reasoned that because the grievance challenged Energy Harbor's compliance with the contribution-increase provision (Art. VIII, ¶ C.2(a)), it implicated the arbitration clause. App. 11. And because Energy Harbor had no "forceful evidence of a purpose to exclude the claim at issue," the arbitration clause applied. *Id.* The District Court adopted the magistrate judge's recommendation.

## II. THIS DISPUTE FALLS OUTSIDE THE ARBITRATION CLAUSE

We review the District Court's reading of the arbitration provision de novo. *Rite Aid of Pa., Inc. v. United Food & Com. Workers Union, Loc. 1776*, 595 F.3d 128, 131 (3d Cir. 2010).

Federal law governs interpretation of collective-bargaining agreements. *Sheet Metal Workers, Loc. 19 v. 2300 Grp., Inc.*, 949 F.2d 1274, 1284 (3d Cir. 1991). But federal law follows general rules of state contract law unless federal labor law conflicts with those rules. *Id.*

To decide whether an arbitration clause applies, we first ask whether it is broad. *Rite Aid*, 595 F.3d at 131. If so, we presume the dispute arbitrable. *Id*. The arbitration clause here is broad. It covers "any dispute or difference" regarding the "interpretation, application, or operation of any provision of this agreement." App. 86 (Art. IX, ¶A). That resembles another clause that we found broad. *See Trap Rock Indus., Inc. v. Loc. 825, Int'l Union of Operating Eng'rs, AFL-CIO*, 982 F.2d 884, 888 n.5 (3d Cir. 1992) (describing as broad a clause that applied to "*[a]ny dispute* arising out of a claimed violation of this Agreement"). So we presume the parties' dispute arbitrable.

Next, we ask if the parties' dispute falls outside the clause's scope. *Rite Aid*, 595 F.3d at 131. To do that, we consider not only the clause itself, but also any other relevant contractual provisions; we are looking for "the most forceful evidence of a purpose to exclude the claim from arbitration." *AT & T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 650 (1986) (internal quotation marks omitted). "Where an arbitration clause in a collective bargaining agreement limits arbitration to those disputes which require interpretation of the agreement, as it does here, a grievance is excluded from arbitration unless it arises from a specific provision in the agreement." *Rite Aid*, 595 F.3d at 132.

5

This grievance is plainly beyond the arbitration clause's scope. It does not claim that the collective-bargaining agreement incorporated the arbitration award. Rather, it challenges Energy Harbor's compliance with its obligation to "adjust the 2022 health care contributions" under Article VIII, ¶C.2. App. 137. The District Court thought that the grievance's reference to ¶ C.2 was enough to make the dispute arbitrable. But that view is far too loose. True, this dispute is about how much Energy Harbor had to contribute toward the Union's health care plan. But that is not enough. Article VIII does not set a base rate of contributions or mandate a particular increase in payments. Rather, it requires only that Energy Harbor match any increases that it makes to its own health care plan each year.

Nothing in the record suggests that Energy Harbor increased funding for its own health care plan from 2021 to 2022. At oral argument, the Union's counsel conceded as much. So the dispute could not arise under Article VIII, ¶C.2(a). In any event, the Union's grievance rests not on such an increase, but on the arbitration award. The award is not an increase that Energy Harbor's health care plan "incurred" from 2021 to 2022. For confirmation, we need look no further than to the arbitration award itself, which required compensation directly to the unions, leaving Energy Harbor's health plan unchanged. Any right that the Union claims flows only from that award, not from the collective-bargaining agreement. The Union's citation of the increase-matching provision is just window dressing.

We need not decide what the arbitration award requires of its own force. The Union does not argue that the award itself requires a lasting increase in Energy Harbor's 2022 plan contributions. Even if it did, that would not call for arbitration

under this agreement. Nor does the Union raise any other provision of the agreement, parol evidence, a course of dealing, or the like.

Resisting our conclusion, the Union protests that looking into whether Energy Harbor's own health care plan expenses increased "inquire[s] into the merits," which courts supposedly may not do in assessing arbitrability. Appellee's Br. 30. But "where the merits and arbitrability questions are inextricably intertwined, a court's arbitrability decision may, of necessity, touch incidentally on the merits." *Rite Aid*, 535 F.3d at 136. For instance, we have looked into the merits to determine and reject arbitrability when a collective-bargaining agreement covered employees as of a date but the plaintiffs had retired before that date. *See Cup v. Ampco Pittsburgh Corp.*, 903 F.3d 58, 63 (3d Cir. 2018).

This case is similar. A dispute is not arbitrable if the "context" of the collective-bargaining agreement makes clear that the agreement has "nothing to do with" the rights that the Union asserted in its grievance. *Rite Aid*, 595 F.3d at 135. So we must peek at the merits to decide whether the contribution discrepancy fits the "context" of Article VIII, ¶C.2. *Id.* Otherwise, any party could gin up access to arbitration just by asserting that the other party had failed to live up to its duties. As we have observed, "[u]nquestioning acceptance of [one party's] characterization of its claims is inconsistent with our duty to determine arbitrability because it leaves the scope of the arbitration clause subject to the unilateral and unfettered discretion of" the party seeking to arbitrate. *Id.* at 132 (internal quotation marks omitted). Our precedent requires a closer look under the hood.

The Union also relies on one of our nonprecedential decisions, which of course does not bind us. *SEIU Healthcare Pa. v. Heritage Valley Health Sys.*, 842 F. App'x 757 (3d Cir. 2021). In any event, that case is inapt. In *SEIU*, the parties did not dispute that the grievance arose under a provision of their agreement. *Id.* at 759. Rather, they disputed whether a different term of the agreement created a separate dispute-resolution path. *Id.* Here, by contrast, the Union's right does not arise under the collective-bargaining agreement at all.

We do not disturb federal labor law's strong preference for arbitration. Only claims to arbitrate rights that have "nothing to do with" the rights covered by the collective-bargaining agreement should be rejected. *Rite Aid*, 595 F.3d at 135. This grievance "has nothing to do with" the Union's rights under the collective-bargaining agreement because, as its counsel concedes, there is no evidence that Energy Harbor incurred an increase in its health care plan costs from 2021 to 2022.

As our dissenting colleague observes, we agree on much. Dissent Part I. We disagree primarily over what facts a party must show to get to arbitration. In particular, our colleague agrees that the record suggests that Energy Harbor's health plan did not incur an increase from 2021 to 2022. Dissent Part II. That conclusion is sound, especially since the arbitrator awarded payment directly to the unions and did not change the Energy Harbor health care plan. But our colleague would hold that these facts are "not for us to decide." *Id.* We disagree because we think these are the same sort of predicate facts as "deciding whether the union was in fact entitled to store access," which our colleague agrees was fine in *Rite Aid*. Dissent Part I (citing *Rite Aid*, 595 F.3d at 136).

8

Our colleague would also find that "an 'assert[ion] that the other party [] failed to live up to its duties' under the CBA *is all that is required* to gain access to arbitration." Dissent Part III (quoting Maj. Op. at Part II) (alteration and emphasis in original). But in *Rite Aid*, the party seeking to arbitrate also asserted that the employer had failed to live up to its duties under three specific provisions of their collective-bargaining agreement. Even so, we held that the dispute was not arbitrable. *Rite Aid*, 595 F.3d at 137. Recognizing this, our colleague would distinguish this case from *Rite Aid* on the facts. Because we think that deciding whether Energy Harbor's health care plan incurred an increase from 2021 to 2022 is not too different from deciding whether the union was in fact entitled to store access, we part ways from our colleague on how to apply *Rite Aid* to these facts.

\* \* \* \* \*

Federal labor law strongly favors arbitration. But there are limits. If the rights claimed are not covered by the contract that contains the arbitration clause, then the dispute falls outside the clause's limits. We will thus REVERSE and REMAND with instructions to grant summary judgment for Energy Harbor.


*Counsel for Appellant*
Eric Baisden          [Argued]
BENESCH FRIEDLANDER COPLAN & ARONOFF

*Counsel for Appellee*
Robert A. Eberle          [Argued]
EBERLE & BUNDICK

9

SMITH, *Circuit Judge*, dissenting.

No doubt, the United States Supreme Court did not intend to slight the Article III judiciary when it recognized "the greater institutional competence of arbitrators in interpreting collective-bargaining agreements." *AT & T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 650 (1986). It is, though, inherent institutional competence that undergirds the "strong" policy favoring the arbitration of labor disputes. *United Steelworkers of Am., AFL-CIO-CLC v. Rohm & Haas Co.*, 522 F.3d 324, 330 (3d Cir. 2008). Labor arbitrators are typically chosen for their familiarity with industry practice and the particular shop(s) at issue, thus will be cognizant of "the effect upon productivity of a particular result, its consequence to the morale of the shop," and "whether tensions will be heightened or diminished." *United Steelworkers of Am. v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 582 (1960). Even "[t]he ablest judge cannot be expected to bring the same experience and competence to bear upon the determination of a grievance[.]" *Id.*; *see Schneider Moving & Storage Co. v. Robbins,* 466 U.S. 364, 371–72 (1984) ("[The presumption of arbitrability in labor disputes] furthers the national labor policy of peaceful resolution of labor disputes and thus best accords with the parties' presumed objectives in pursuing collective bargaining.").

Flowing from this policy in favor of arbitration is the principle that, "even if it appears to the court to be frivolous, [a] union's claim that [an] employer has violated [a] collective-

1

bargaining agreement is to be decided, not by the court asked to order arbitration, but as the parties have agreed, by the arbitrator." *AT & T*, 475 U.S. at 649–50. That principle applies no less to the case before us. Here, the union seeks proper redress for a violation of an applicable CBA provision and thus its claim must be decided by an arbitrator. Accordingly, I dissent from the majority's holding that the grievance filed by Local 29 of the I.B.E.W. falls outside the reach of the applicable CBA's arbitration provision.

I

There is much here upon which the majority and I can agree. To begin, I agree that the arbitration clause is broad. Majority Op. at Section II. As such, we presume the dispute arbitrable. *See Rite Aid of Pennsylvania, Inc. v. United Food & Com. Workers Union, Loc. 1776*, 595 F.3d 128, 131 (3d Cir. 2010). This presumption "may be rebutted only by 'the most forceful evidence of a purpose to exclude the claim from arbitration.'" *Id.* (*citing AT & T*, 475 U.S. at 650). Described as such, it is not just *any* presumption. It erects a very high hurdle for a party seeking to overcome it. However, "arbitration is still a creature of contract and a court cannot call for arbitration of matters outside of the scope of the arbitration clause." *Rohm & Haas Co.*, 522 F.3d at 332. And as the majority correctly points out, a grievance is within the scope of a broad arbitration provision when it "arises from a specific provision in the agreement." *Rite Aid*, 595 F.3d at 132. I believe that the Union's grievance does just that.

2

In order to determine whether a grievance "arises from" a specific CBA provision, it is first necessary to tease out the subtle yet important difference between a frivolous claim and a claim that falls outside the scope of a CBA's broad arbitration provision. A frivolous claim is one that "lacks an arguable basis either in law or in fact." *Neitzke v. Williams*, 490 U.S. 319, 325 (1989). The Supreme Court's decision in *United Steelworkers of America v. American Manufacturing Co.* illustrates that principle. 363 U.S. 564 (1960). In *American Manufacturing*, union-member James Sparks was involved in an accident which left him—according to his physician—"25% permanently partially disabled." *Id.* at 565 (internal quotations omitted). Following the accident, Sparks was not permitted to return to his old job. *Id.* In response, his union filed a grievance seeking Sparks' reinstatement based upon a CBA clause mandating that the employer "employ and promote" based on seniority "where ability and efficiency are *equal*." *Id.* at 565–66 (emphasis added). The Sixth Circuit held that the clear deleterious effect of Sparks' injury made the grievance, and the invocation of the relevant CBA clause, "frivolous," and thus not subject to arbitration. 264 F.2d 624, 628 (6th Cir. 1959). The Supreme Court reversed, reasoning that "[t]he union claimed . . . that the company had violated a specific provision of the contract," and that the Court is "confined to ascertaining whether the party seeking arbitration is making a claim which on its face is governed by the contract." 363 U.S. at 568–69. In short, frivolous claims may still be arbitrable. If the union

3

alleges a violation of a right contained in the governing CBA, the court cannot scrutinize *why* the union thinks that right has been violated.

Contrast *American Manufacturing* with this Court's decisions in both *Cup v. Ampco Pittsburgh Corporation* and *Rite Aid*. In *Cup*, a union filed a grievance challenging an employer's elimination of retirees from its health plan. 903 F.3d 58, 60 (3d Cir. 2018). Though the at-issue CBA contained no provision applicable to retiree medical benefits, the union argued that (1) retirees fell under the definition of "employee" under the CBA, and (2) the elimination violated a memorandum of agreement predating the CBA and allegedly incorporated into the CBA by reference. *Id.* at 63. We characterized our duty there to be "ascertain[ing] whether the CBA provides for retiree health benefits." *Id.* We concluded that it did not. *Id.* at 64. Notice, however, that we followed the direction of *American Manufacturing*: our inquiry focused on whether the asserted right was provided for in the CBA. *Cf. Litton Fin. Printing Div., a Div. of Litton Bus. Sys., Inc. v. N.L.R.B.*, 501 U.S. 190 (1991) (refusing to compel arbitration where the disputed right did not survive the expiration of the CBA).

*Rite Aid* tells a similar story. In *Rite Aid*, the union submitted a grievance alleging that Rite Aid violated a CBA by preventing union representatives from soliciting employees inside newly acquired Rite Aid stores. 595 F.3d at 130. The union cited three provisions of the CBA which it claimed gave

4

it the right to store-access. *Id.* Because the merits of the union's claim turned on whether the CBA guaranteed a right to store access, determining arbitrability—whether the claim fell within the scope of the CBA—necessarily also decided the merits issue. *Id.* at 136. As described by the *Rite Aid* court, "the merits and arbitrability questions [were] inextricably intertwined," meaning "[the] court's arbitrability decision may, of necessity, touch incidentally on the merits." *Id.* We, in turn, examined each of the three cited provisions and determined that none gave the union a right to solicit inside newly acquired stores. *Id.* at 132–36.

The majority sees the instant case as similar to *Rite Aid*. Majority Op. at Section II ("[W]e think that deciding whether Energy Harbor's health care plan incurred an increase from 2021 to 2022 is not too different from deciding whether the union was in fact entitled to store access, . . . ."). The case before us, though, does not present a circumstance where the merits and arbitrability are "inextricably intertwined." In *Rite Aid*, the relevant determination—whether the CBA entitled the union to challenge store access—could not be made without also deciding whether the union was *in fact* entitled to store access. *Id.* Here, the relevant determination—whether the CBA entitles the union to challenge adjustments in healthcare contributions—can (and should) be made without reference to whether the union is *in fact* entitled to an adjustment (i.e. whether Energy Harbor's plan in fact incurred an increase). As in *Cup*, our focus in *Rite Aid* remained on whether the asserted

5

right could be found in the CBA. In my view, this binding caselaw mandates we do the same here.

## II

Article VIII, ¶C.2, of the CBA states, in relevant part: "the company's monthly contributions will be increased by the same percentage as any increase incurred by the Company's Health Care Plan from the previous year." App'x at 83. And the majority and I agree that the union's grievance "challenges Energy Harbor's compliance with its obligation to 'adjust the 2022 health care contributions' under article VIII, ¶C.2.'" Majority Op. at Section II. In other words, Energy Harbor is asserting its right under the CBA to "adjust the 2022 health care contributions." App'x at 31. This right, like the right at issue in *American Manufacturing* and unlike the rights at issue in *Cup* and *Rite Aid*, is plainly found in CBA article VIII, ¶C.2.

The majority instead finds that the "context" of the agreement makes clear that the CBA has "nothing to do with" the right asserted in the union's grievance. Majority Op. at Section II. In effect, this is a finding that the CBA—which governs increases in "the company's monthly contributions," App'x at 83—has "nothing to do with" "Energy Harbor's . . . obligation 'to adjust the 2022 health care contributions.'" Majority Op. at Section II. The majority's reliance on "context" suggests to me not only a counterintuitive conclusion but also an impermissible determination of the grievance's merits.

6

The majority first states that the CBA "requires only that Energy Harbor match any increases that it makes to its own health care plan each year." Majority Op. at Section II. Then, it finds that "[n]othing in the record suggests that Energy Harbor increased funding for its own health care plan from 2021 to 2022,"[1] meaning "the dispute could not arise under [the CBA]." *Id*. Whether the record suggests that Energy Harbor increased funding for its health care plan is, however, irrelevant to the inquiry mandated by the Supreme Court and our own precedent: whether the CBA entitles the union to challenge adjustments in healthcare contributions.

The majority instead mirrors the Sixth Circuit's analysis in *American Manufacturing*, *see* 264 F.2d at 628 ("[The evidence proffered by the union] is so lacking in probative value with respect to the issue in this case as to compel the conclusion that the so-called claim or grievance is a frivolous, patently baseless one, not subject to arbitration under the [CBA]."), which the Supreme Court rejected, *see* 363 U.S. at 569 ("Arbitration should have been ordered. When the

---

[1] The majority states that this point was conceded by the union at oral argument; however, that is only true if one accepts the majority's merits argument that "[t]he award is not an increase that Energy Harbor's health plan "incurred" from 2021 to 2022." I agree with the majority that the record suggests it is not. Majority Op. at Section II. But that is not for us to decide, which is the very heart of my disagreement with the majority.

7

judiciary undertakes to determine the merits of a grievance under the guise of interpreting the grievance procedure of collective bargaining agreements, it usurps a function which under that regime is entrusted to the arbitration tribunal."). The only difference here is that, while the Sixth Circuit's ultimate conclusion sounded in the merits, the majority's conclusion is framed in terms of the agreement's scope. The basis—the frivolousness of the claim—remains the same.

## III

Finally, the majority expands the relevant policy concerns, thereby permitting its intrusion into the merits. In *AT & T*, the Supreme Court worried that a labor arbitrator might be "empowered 'to impose obligations outside the contract."[2] 475 U.S. at 651. Similarly, the *Rite Aid* court worried that the "scope of the arbitration clause" may be "subject to the unilateral and unfettered discretion of the Union." *Rite Aid*, 595 F.3d at 132 (quoting *E.M. Diagnostic Sys., Inc. v. Loc. 169, Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am.*, 812 F.2d 91, 95 (3d Cir. 1987)). Both formulations share the concern that a party may gain access to arbitration over

---

[2] The Supreme Court was concerned that this would result from a labor arbitrator's ability to determine her own jurisdiction. *AT & T*, 475 U.S. at 651. Though this case concerns the union's discretion rather than that of the arbitrator, the "wrong" to be avoided remains the same.

8

rights *not contained in the CBA*.[3] But that is not what troubles the majority.

Instead, the majority expresses a concern that "any party could gin up access to arbitration just by asserting that the other party had failed to live up to its duties." Majority Op. at Section II. However, an "assert[ion] that the other party [] failed to live up to its duties" under the CBA *is all that is required* to gain access to arbitration.[4] The only alternative, seemingly endorsed by the majority but rejected by the Supreme Court, is that the party must make a *meritorious* or *nonfrivolous* assertion that the other party failed to live up to its CBA duties. *See American Manufacturing*, 363 U.S. at 568 ("The agreement is to submit all grievances to arbitration, not merely those which the court will deem meritorious.").

---

[3] The union's grievance does not implicate this concern. Were it to succeed, the union's relief would be limited to an adjustment in contributions as governed by the CBA. Energy Harbor runs no risk of being bound by terms or obligations beyond the CBA's scope.

[4] In response, the majority points out that the *Rite Aid* court held a dispute not arbitrable despite the union's assertion that the other party breached the CBA. Majority Op. at Section II. This misses the mark. It is not that a party need assert only that *the CBA creates a duty*, but rather that a party need only assert that a specific duty created by the CBA *has been breached*. The union in *Rite Aid* asserted the former, and was found to be incorrect. The union here asserts the latter.

9

## IV

I am not aware of any instance where this court has held that a union cannot compel arbitration when it invokes a right squarely contained in a CBA with a broad arbitration clause. Doing so contradicts this court's precedent and undermines policy considerations to which the Supreme Court has given voice. Accordingly, I respectfully dissent.