AMBRO, Circuit Judge,
dissenting.
The Majority concludes that the Union’s grievances are not arbitrable based on its assessment of the merits of the Union’s claims. Because I do not believe that analysis is authorized by either Supreme Court precedent or our own precedent, I respectfully dissent.

I. Background

To review, United Food and Commercial Workers Union, Local 1776 (the “Union” or “Local 1776”), has represented Rite Aid employees in 24 Pennsylvania counties for *138 several decades. In June 2007, Rite Aid acquired a drugstore chain formerly operated by Brooks Eckerd. Several of these stores are located in counties covered by a collective bargaining agreement (the “CBA”)[9] between Ride Aid and Local 1776. During September and October 2007, representatives of Local 1776 attempted to enter six of these stores to solicit employee interest in joining the Union. Rite Aid barred these representatives from entering the stores.
In November 2007, Local 1776 Executive Vice President Nicholas Farina filed three identical grievances with Niels Hansen — Rite Aid’s Director of Labor Relations — alleging that Rite Aid had interfered with the Union’s “exercise of [its] visitation rights as prescribed under the [CBA].” Mr. Hansen denied the grievances, relying on Rite Aid’s “no solicitation” policy. That policy — for which the effective date is unknown — prohibits the “Solicitation for any cause or distribution of material ... if one or more of the Rite Aid Associates engaged in the interaction is on working time.” The policy does not reference Union activities, but purports to apply to “associate and non-associate activity on behalf of any cause or organization, with the exception of Company-sponsored charity events.”
When Local 1776 advised Rite Aid of its intent to submit the grievances to arbitration, Rite Aid filed a complaint in the federal District Court for the Middle District of Pennsylvania seeking a declaratory judgment that the Union’s grievances were not arbitrable.[10] The parties filed cross-motions for summary judgment with supporting declarations.[11] In March 2009, the District Court granted Rite Aid’s motion and denied the Union’s motion. This appeal followed.

II. The Steelworkers Principles

Fifty years ago, the Supreme Court decided three cases, collectively known as the “Steelworkers Trilogy,” which establish the principles that guide our determination of whether a grievance is arbitrable. See United Steelworkers of Am. v. Am. Mfg. Co., 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960); United Steelworkers of Am. v. Warrior & Gulf Navigation Co., 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); United Steelworkers of Am. v. Enter. Wheel & Car Corp., 363 U.S. 593, 80 S.Ct. *139 1358, 4 L.Ed.2d 1424 (1960). As the Supreme Court has observed, “[t]hese precepts have served the industrial relations community well, and have led to continued reliance on arbitration ... as the preferred method of resolving disputes arising during the term of a collective-bargaining agreement.” AT & T Techs., Inc. v. Commc’ns Workers of Am., 475 U.S. 643, 648, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986). Those precepts are as follows.
(1) “[Arbitration is a matter of contract!,] and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.” Warrior & Gulf, 363 U.S. at 582, 80 S.Ct. 1347.
(2) Unless the parties “clearly and unmistakably provide otherwise, the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator.” AT & T Techs., 475 U.S. at 649, 106 S.Ct. 1415 (citing Warrior & Gulf, 363 U.S. at 582-83, 80 S.Ct. 1347).
(3) In deciding whether the parties have agreed to arbitrate a particular grievance, courts may “not ... rule on the potential merits of the underlying claims.” Id. The Supreme Court has stated this prohibition in forceful terms:
Whether “arguable” or not, indeed even if it appears to the court to be frivolous, the union’s claim that the employer has violated the collective-bargaining agreement is to be decided, not by the court asked to order arbitration, but as the parties have agreed, by the arbitrator. “The courts, therefore, have no business weighing the merits of the grievance, considering whether there is equity in a particular claim, or determining whether there is particular language in the written instrument which will support the claim. The agreement is to submit all grievances to arbitration, not merely those which the court will deem meritorious.”
Id. at 649-650, 106 S.Ct. 1415 (quoting Am. Mfg. Co., 363 U.S. at 568, 80 S.Ct. 1343) (emphasis added).
Thus, where the parties have agreed to “submit all questions of contract interpretation to the arbitrator,” the court’s function is “very limited”; “[i]t is confined to ascertaining whether the party seeking arbitration is making a claim which on its face is governed by the contract.” Am. Mfg. Co., 363 U.S. at 567-68, 80 S.Ct. 1343. This principle implements the “federal policy of settling labor disputes by arbitration!, which] would be undermined if courts had the final say on the merits” of a grievance. Enter. Wheel & Car Corp., 363 U.S. at 596, 80 S.Ct. 1358. Accordingly, “[a] court should view with suspicion an attempt to persuade it to become entangled in the construction of the substantive provisions of a labor agreement, even through the back door of interpreting the arbitration clause, when the alternative is to utilize the services of an arbitrator.” Warrior & Gulf, 363 U.S. at 585, 80 S.Ct. 1347.
(4) A presumption of arbitrability applies where a collective bargaining agreement contains an arbitration provision. This presumption is “particularly applicable” where, as here, the arbitration provision is broad. AT & T Techs., 475 U.S. at 650, 106 S.Ct. 1415 (arbitration provision that provided for arbitration of “any differences arising with respect to the interpretation of this contract or the performance of any obligation hereunder” was broad); see also Warrior & Gulf, 363 U.S. at 576, 80 S.Ct. 1347 (arbitration provision that provided for arbitration of “differences ... as to the meaning and application of the provisions” of the collective bargaining agreement was broad). “In such cases, ‘[i]n the absence of any express provision excluding a particular grievance from arbitration, ... only the most forceful evidence *140 of a purpose to exclude the claim from arbitration can prevail.’ ” AT & T Techs., 475 U.S. at 650, 106 S.Ct. 1415 (quoting Warrior & Gulf, 363 U.S. at 584-85, 80 S.Ct. 1347) (emphasis added) (alteration in original).

III. Discussion

We have identified three questions to guide our application of the Steelworkers principles where the bargaining agreement’s arbitration provision is broad and the presumption of arbitrability applies:
(1) Does the present dispute come within the scope of the arbitration clause?[;]
(2) does any other provision of the contract expressly exclude this kind of dispute from arbitration?!;] and (3) is there any other ‘forceful evidence’ indicating that the parties intended such an exclusion?
E.M. Diagnostic Sys., Inc. v. Local 169, Int’l Bhd. of Teamsters, 812 F.2d 91, 95 (3d Cir.1987); accord United Steelworkers of Am. v. Rohm and Haas Co., 522 F.3d 324, 331 (3d Cir.2008). I address these questions in turn.

A. The Union’s Grievances Come Within The Scope Of The Arbitration Provision

The parties’ CBA contains a provision governing the procedure for the fifing and arbitration of grievances, which states that “[n]o grievance shall be filed by ... the Union, nor need [Rite Aid] entertain any grievance that does not involve the interpretation of any provision of this Agreement.” This provision thus limits the grievances that the Union may file — and, if rejected by Rite Aid, refer to arbitration— to those that “involve the interpretation of any provision of’ the CBA.
The Union’s asserted right to enter Rite Aid stores for the purpose of soliciting membership is founded on its interpretation of three provisions of the CBA — the “Recognition,” “Observation,” and “Privileges” Provisions. Accordingly, the Union argues that its grievances fall within the “scope” of the CBA’s arbitration mandate because it has made a claim which “on its face is governed by the [CBA],” Am. Mfg. Co., 363 U.S. at 567-68, 80 S.Ct. 1343— that is, on its face Local 1776’s asserted right of store access “involve[s] the interpretation” of provisions of the CBA.

1. The Distinction Between The Subject Matter And The Merits Of A Grievance

The Union’s characterization of its grievances is not the end of the matter. As the Majority points out, “[unquestioning acceptance of the Union’s characterization of its claims” would “ ‘leave[ ] the scope of the arbitration clause subject to the unilateral and unfettered discretion of the Union.’ ” Maj. Op. at 132 (quoting E.M. Diagnostic, 812 F.2d at 95). The concern is that an arbitration proponent could achieve arbitration of a grievance — the subject matter of which is wholly outside the scope of the collective bargaining agreement — simply by “cit[ing] to a particular provision of the CBA,” claiming that its “grievance arises thereunder,” and contending that a court would be impermissibly reviewing the merits if it were to reject the Union’s characterization. Id.
We addressed this concern in E.M. Diagnostic, where we considered the arbitrability of a grievance challenging a company’s decision to subcontract work to an agency that did not employ members of the union. 812 F.2d at 92. Because the arbitration provision was broad,[12] we ap *141 plied the presumption of arbitrability and concluded that the grievance was arbitrable, even though (1) the collective bargaining agreement there explicitly granted the company the right to subcontract, and (2) the grievance simply alleged that the employer’s decision to subcontract was “unfair” and “a clear case of violating the contract.” Id.
Despite our concluding that the grievance was arbitrable, we rejected the union’s argument that its bare claim of a “violation” of the collective bargaining agreement was alone sufficient to make the dispute arbitrable, as “[sjuch an interpretation ... leaves the scope of the arbitration clause subject to the unilateral and unfettered discretion of the Union.” Id. at 95. Instead, we adopted the following test for determining whether a grievance comes within the “scope” of an arbitration provision:
It will suffice for present purposes to hold that a claimed contract violation comes within the scope of an arbitration clause of this character when the subject matter of the grievance is one that is within the zone of interests that have received protection in the collective bargaining agreement. To require more, we believe, would infringe upon territory reserved for arbitrators in AT & T Technologies.
Id. (emphasis added). Applying this test, we had “no difficulty” concluding that the union’s subcontracting grievance fell within the “zone of interests” protected by the collective bargaining agreement. Id. at 96. We reasoned that though the agreement granted the company the right to subcontract, there must be “implicit” limits on that right; otherwise, the company could subcontract all work in the bargaining unit, which would be “inconsistent with the [collective bargaining] agreement’s recognition of the Union as the bargaining agent for the Company’s employees.” Id.
Underlying our decision in E.M. Diagnostic is the crucial distinction between two inquiries: (1) whether a grievance comes within the “scope” of the arbitration provision (i.e., whether its subject matter falls within “the zone of interests that have received protection” in the collective bargaining agreement); and (2) whether the grievance itself has merit. In my view, distinguishing between these questions is critical to ensuring that we do not overstep our “very limited” role in determining whether a grievance must be arbitrated. Am. Mfg. Co., 363 U.S. at 567, 80 S.Ct. 1343.
To demonstrate, imagine a collective bargaining agreement that requires the employer to pay employees overtime wages for work in excess of 35 hours a week. Imagine further that the Union files a grievance challenging the employer’s refusal to pay overtime wages for work in excess of 30 hours a week. In such a circumstance, we could rightfully characterize the Union’s grievance as “frivolous,” given the agreement’s express language to the contrary. We could not, however, say that the “subject matter” of the grievance — ie., the circumstances in which the employer is required to pay overtime wages to its employees — falls outside the “zone of interests” that have received protection in the agreement. Rather, we are compelled to call for arbitration of the dispute because, although the grievance “appears ... to be frivolous, the union’s claim that the employer has violated the collective bargaining agreement is to be decided, not by the court asked to order arbitration, but as the parties have agreed, by the arbitrator.” AT & T Techs., 475 U.S. at 649-50, 106 S.Ct. 1415. Indeed, a *142 contrary position would “reduce[ ] to an assertion” that the obligation to pay overtime wages only for work in excess of 35 hours a week “is so clear on the face of the agreement that there is no need for arbitration,” which is “but another way of saying that the Union’s grievance is frivolous.” E.M. Diagnostic, 812 F.2d at 97.
Contrast that situation with a grievance that, in addition to appearing frivolous, involves a subject matter wholly outside the scope of the collective bargaining agreement. For example, a grievance challenging an employer’s “decision to terminate the distribution of Christmas turkeys to its employees,” in the context of an arbitration provision that applies only to grievances involving “the interpretation and application of ... specific provisions of [the collective bargaining agreement]” (which do not include a provision even remotely applicable to the employer’s prior practice of distributing Christmas turkeys), is rightly regarded as being outside the “scope of ... arbitrable matter[s],” in addition to being frivolous. Boeing Co. v. Int’l Union, UAW, 349 F.2d 412, 413 (3d Cir.1965); see also E.M. Diagnostic, 812 F.2d at 96 n. 2 (describing Boeing Co. as a case where “the subject matter of the union’s grievance was whol[]ly unrelated to any interest protected by the collective bargaining agreement”).

2. The Subject Matter Of The Union’s Grievances Comes Within The “Zone Of Interests” Protected By The CBA

Rather than explaining why the Union’s grievances do not satisfy the “zone of interests” test, Maj. Op. at 132, the Majority asks whether (1) the Union’s grievances “genuinely” or “sufficiently implicate[ ]” any provision of the CBA, id. at 132, 135; (2) the grievances “rais[e] a legitimate question of the CBA’s interpretation,” id. at 132; (3) the Recognition, Observation, and Privileges Provisions are “susceptible of [the] interpretation” the Union advances, id. at 134; and/or (4) the right of store access the Union seeks to enforce can be “plausibly derived” from these provisions, id. In so doing, I believe the Majority strays from permissibly determining whether the Union’s grievances “come within the scope” of the arbitration provision, E.M. Diagnostic, 812 F.2d at 95, to impermissibly determining “whether there is particular language in the [CBA] which will support the [Union’s] claim.” Am. Mfg. Co., 363 U.S. at 568, 80 S.Ct. 1343.
I express no view on the ultimate merits of the Union’s grievances or its interpretations of the Observation, Recognition, or Privileges Provisions. I conclude, however, that (1) at least one of these provisions — the Recognition Provision — sufficiently demonstrates that the Union’s asserted right of store access falls within the “zone of interests” that have received protection in the CBA; and (2) the Union’s interpretation of the Recognition Provision is not nearly as implausible as the Majority suggests.
The CBA’s Recognition Provision provides, in pertinent part (and with emphasis added):
[Rite Aid] recognizes the Union as the sole and exclusive bargaining agent for the purpose of bargaining in the Bargaining Unit in respect to rates of pay, wages, hours of employment, and other conditions pertaining to employment for ... [a]ll full time and part time selling and non-selling associates employed at [Rite Aid] stores [within the counties identified in the CBA],
This provision does not distinguish between existing and newly acquired stores; rather, it applies to “all” employees “employed at [Rite Aid] stores” within the *143 counties covered by the CBA. Accordingly, under a literal reading, it requires Rite Aid to recognize the Union as the “sole and exclusive bargaining agent” for all employees in Rite Aid stores, whether existing at the time the CBA was entered or acquired thereafter.
In 1974, the National Labor Relations Board (“NLRB”) ruled that provisions of this character — also referred to as “additional stores” provisions — are unlawful because, when read literally, they purport to make the Union automatically the “exclusive bargaining agent” for employees in newly acquired or opened stores, without a Board-directed election or other demonstration of majority support. See Houston Div. of the Kroger Co. (Kroger I), 208 N.L.R.B. 928, 929 (1974) (“We will not permit parties to include employees in a newly created presumptively appropriate unit into a larger unit without a proper assessment of employee sentiment as to representation.”). A year after Kroger I, the Court of Appeals for the D.C. Circuit disagreed with the Board’s conclusion regarding the invalidity of such provisions, and concluded that they must “be interpreted to mean that the employer waives its right to a Board ordered election.” Retail Clerks Int’l Ass’n Local No. 155 v. NLRB, 510 F.2d 802, 806 (D.C.Cir.1975); see also NLRB v. Retail Clerks Local 588, 587 F.2d 984, 986 n. 2 (9th Cir.1978) (agreeing that such provisions “waive the employer’s absolute right to demand an election; instead the employer must accept alternative methods of proving majority support”). The Court noted, however, that “[t]he specific non-election recognition procedures which the clauses permit is a matter for the parties to consider in the first instance,” and “express[ed] no opinion whether authorization cards [ie., cards that designate the union as the employee’s bargaining agent] or other procedures may be utilized or objected to consistent with the[se] clauses.” Retail Clerks, 510 F.2d at 806. On remand, the NLRB adopted the D.C. Circuit Court’s interpretation, agreeing that such provisions are valid to the extent they operate as “contractual commitments by the Employer to forgo its right to resort to the use of the Board’s election process in determining the Unions’ representation status in ... new stores.” Houston Div. of the Kroger Co. (Kroger II), 219 N.L.R.B. 388, 389 (1975).
The Union argues that, in light of Kroger I and Kroger II, the Recognition Provision is ambiguous because it cannot mean what it literally says — ie., it purports to make the Union automatically the “sole and exclusive bargaining agent” for employees in newly-acquired stores, despite the requirement of some showing of majority support as a prerequisite for such status. Moreover, the argument continues, although the Recognition Provision operates as a waiver of Rite Aid’s right to demand a Board-ordered election, neither the Recognition Provision nor any other provision of the CBA sets out the “specific non-election recognition procedures” by which the Union may show majority support in newly acquired stores, Retail Clerks, 510 F.2d at 806, including whether Union representatives may enter newly acquired stores for the purpose of obtaining such majority support.
Accordingly, the Union seeks the opportunity through arbitration to demonstrate, based on the parties’ past practices and/or custom, that they understood the Recognition Provision to grant the Union the right to enter newly acquired stores for the purpose of soliciting membership.[13] See, *144 e.g., Consol. Rail Corp. v. Ry. Labor Executives’ Ass’n, 491 U.S. 299, 811, 109 S.Ct. 2477, 105 L.Ed.2d 250 (1989) (explaining that “collective-bargaining agreements may include implied, as well as express, terms,” and that “it is well established that the parties’ practice, usage and custom [are] of significance in interpreting their agreement”) (internal quotation marks omitted); see also Warrior & Gulf, 363 U.S. at 581-82, .80 S.Ct. 1347 (“The labor arbitrator’s source of law is not confined to the express provisions of the contract, as the industrial common law — the practices of the industry and the shop — is equally a part of the collective bargaining agreement although not expressed in it.”).
Is the Union’s position far-fetched? Hardly. For though the Majority dismisses that position as “unpersuasive,” Maj. Op. at 134, the Union has submitted an arbitration decision reaching in a similar ease the very result it asks for, see 2005 AAA LEXIS 383 (2005) (Shaw, Arb.),[14] as well as a decision by the federal District Court for the District of Oregon enforcing a similar arbitration decision. See Albertson’s Inc. v. Local 555, No. 97-977-JO, slip op. (D.Or. Mar. 16, 1998).[15] Both of these arbitrations concerned a grievance challenging an employer’s refusal, purportedly pursuant to a non-solicitation policy, to permit union representatives to enter new stores to solicit membership. See 2005 AAA LEXIS 383, at *1; Albertson’s, No. 97-977-JO, slip op. at 14-15. And in both the arbitrator — relying on the ambiguity in the parties’ recognition provisions resulting from the Kroger decisions — determined that the parties’ past practices demonstrated that they understood the bargaining agreement to grant the union the right to enter new stores to solicit membership. See 2005 AAA LEXIS 383, at *45-46; Albertson’s, No. 97-977-JO, slip op. at 14. These decisions serve only to underscore that the Union’s asserted right of store access is, at the least, “not so plainly unreasonable that [it] must be regarded as nonarbitrable because it can be seen in advance that no award to the Union could receive judicial sanction.”[16] *145 John Wiley & Sons, Inc. v. Livingston, 376 U.S. 543, 555, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964) (citing Warrior & Gulf, 363 U.S. at 582-83, 80 S.Ct. 1347).
Moreover, the Union’s grievances present at least as strong a case for arbitrability as the grievance in E.M. Diagnostic, where we relied on “implicit” limits on the company’s explicit right to subcontract to conclude that the grievance was arbitrable. 812 F.2d at 96. Just as the company’s subcontracting all work in the bargaining unit would have been “inconsistent with the [collective bargaining] agreement’s recognition of the Union as the bargaining agent for the Company’s employees,” id,., Rite Aid’s refusal to allow Union representatives to enter newly acquired stores to solicit Union membership and distribute authorization cards — the obvious alternative to initiating an NLRB-directed election (the right to which Rite Aid has waived by virtue of Kroger II) — is inconsistent with the Recognition Provision. Indeed, it would be anomalous if Rite Aid could avoid the apparent intent of the Recognition Provision — i.e., recognizing the Union as the bargaining agent for employees in newly acquired stores without requiring the parties to go through an NLRB-directed election — by preventing the Union from showing majority support through this alternative procedure.
In sum, I believe the Recognition Provision sufficiently demonstrates that the subject matter of the Union’s grievances falls within the zone of interests that have received protection in the CBA,[17] and thus falls within the scope of the CBA’s broad arbitration clause. In seeking to compel arbitration, the Union is not attempting to enforce a right that is “wholly outside the scope of the CBA,” Maj. Op. at 136, such as forcing Rite Aid to distribute Christmas Turkeys to its employees, Boeing Co., 349 F.2d at 413. Rather, the Union seeks to enforce, by arbitrating the meaning of an ambiguous provision of the CBA, an asserted right that implicates a fundamental aspect of the parties’ ongoing relationship under that agreement. With scant evidence of the parties’ past practices, understandings, prior agreements, or bargaining history, we are ill-equipped to decide *146 whose interpretation of the Recognition Provision is correct. Rather, that function is properly fulfilled by an arbitrator, as the parties have agreed.[18] Cf. United Steel Workers Int’l Union v. TriMas Corp., 531 F.3d 531, 536 (7th Cir.2008) (“If the parties have in fact agreed to arbitrate their dispute, then they have bargained for the arbitrator’s interpretation of their contract — not ours.... If we were to weigh in on the merits of their ease, we would be denying them the benefit of that bargain.”) (emphasis in original) (internal citation omitted).

3. The Merits And The Issue Of Arbitrability Are Not “Inextricably Intertwined”

The Majority, like the District Court, also relies on Litton Financial Printing Division v. National Labor Relations Board, 501 U.S. 190, 111 S.Ct. 2215, 115 L.Ed.2d 177 (1991), to justify its consideration of the merits of the Union’s grievances. The Majority concludes that (1) Litton authorizes courts to consider the merits of grievances whenever “the merits and arbitrability questions are inextricably intertwined,” Maj. Op. at 136; and (2) *147 these questions are necessarily “intertwined” where a collective bargaining agreement “limit[s] the scope of arbitration to matters regarding the agreement or its construction,” id. at 136. Litton does not support either of these conclusions.
In Litton, the Supreme Court considered the arbitrability of grievances filed on behalf of employees who were laid off almost one year after the parties’ collective bargaining agreement had expired. To determine whether the grievances were arbitrable, the Court first sought to interpret its decision in Nolde Brothers, Inc. v. Local No. 858, Bakery & Confectionary Workers Union, 430 U.S. 243, 97 S.Ct. 1067, 51 L.Ed.2d 300 (1977), which announced a presumption in favor of post-expiration arbitration unless “negated expressly or by clear implication,” and held that, in determining whether a post-expiration grievance is arbitrable, courts should determine whether the grievance “arises under” the expired agreement. Id. at 253, 255, 97 S.Ct. 1067. The Litton Court explained that, to “arise under” an expired collective bargaining agreement, the grievance must “involve[ ] facts and occurrences that arose before expiration, where an action taken after expiration infringes a right that accrued or vested under the agreement, or ..., under normal principles of contract interpretation, [involves] [a] disputed contractual right [that] survives expiration of the remainder of the agreement.” Litton, 501 U.S. at 206, 111 S.Ct. 2215. Applying this rule, the Court determined that the seniority rights the employees sought to enforce did not “arise” out of the expired collective bargaining agreement because “factors such as aptitude and ability” — on which application of the seniority provision was dependent — “do not remain constant, but change over time.” Id. at 210, 111 S.Ct. 2215 (“We cannot infer an intent on the part of the contracting parties to freeze any particular order of layoff or vest any contractual right as of the Agreement’s expiration.”).
The Litton Court acknowledged that, in determining that seniority rights did not “arise” under the expired agreement, it had (1) interpreted a substantive provision of the collective bargaining agreement (the seniority provision), and (2) necessarily reached the merits of the grievances. See id. at 208-09, 111 S.Ct. 2215. The Court explained, however, that the presumption of arbitrability should not apply with its usual force in the context of post-expiration grievances:
We acknowledge that where an effective bargaining agreement exists between the parties, and the agreement contains a broad arbitration clause, “there is a presumption of arbitrability in the sense that ‘[a]n order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.’ ” But we refuse to apply that presumption wholesale in the context of an expired bargaining agreement, for to do so would make limitless the contractual obligation to arbitrate. Although “[d]oubts should be resolved in favor of coverage,” we must determine whether the parties agreed to arbitrate this dispute, and we cannot avoid that duty because it requires us to interpret a provision of a bargaining agreement.
Id. at 209, 111 S.Ct. 2215 (quoting AT & T Techs., 475 U.S. at 650, 106 S.Ct. 1415) (emphasis added).
The Majority interprets Litton as follows: “Because the Agreement limited the scope of arbitration to matters regarding the agreement or its construction,[19] the *148 Supreme Court in Litton found it necessary to interpret the agreement in order to properly determine the question of arbitrability.” Maj. Op. at 136-37. I believe this is incorrect. The Litton Court did not justify its consideration of the merits based on the language of the parties’ arbitration provision, but rather on its concern that applying the presumption of arbitrability “in the context of an expired bargaining agreement ... would make limitless the contractual obligation to arbitrate.” Litton, 501 U.S. at 209, 111 S.Ct. 2215 (emphasis added). Indeed, in refusing to apply the presumption of arbitrability “wholesale” in this context, id., the Court seems to have assumed that applying the presumption with its normal force would have required arbitration (in light of the collective bargaining agreement’s broad arbitration provision).
To support its reading of Litton, the Majority relies on two decisions from our sister circuits applying Litton outside the context of post-expiration grievances. However, these cases involved a similarly narrow issue: whether grievances brought on behalf of individuals who had either been elevated to supervisory positions, or had retired, were covered under bargaining agreements that applied only to “employees.” See Int’l Bhd. of Elec. Workers, Local 1 v. GKN Aerospace N.A., Inc., 431 F.3d 624, 629 (8th Cir.2005) (where arbitration provision applied only to grievances submitted by “employees,” supervisor’s grievance was not arbitrable because “a plain reading” of the collective bargaining agreement did “not permit the possible inference that [the supervisor] ha[d] a right to return to the bargaining unit”); Indep. Lift Truck Builders Union v. Hyster Co., 2 F.3d 233, 235-36 (7th Cir.1993) (district court erred in compelling arbitration of retired employee’s grievance without deciding whether “the collective bargaining agreement covers retired employees,” because, in so doing, the court had “order[ed] the dispute to arbitration without first determining that it was arbitrable”); see also United Steelworkers of Am., Local No. 1617 v. Gen. Fireproofing Co., 464 F.2d 726, 729 (6th Cir.1972) (holding, pre-Litton, that supervisor’s grievance was not arbitrable because the “plain meaning” of the collective bargaining agreement’s arbitration provision was “that the Company has agreed to process any and all disputes involving its ‘employees’ through the grievance procedures (including arbitration), but that disputes concerning supervisory personnel are not included”).[20]
In this context, these courts reasoned that the merits of the grievances and the question of arbitrability were “intertwined,” GKN Aerospace, 431 F.3d at 627, or “collaps[ed] into the same inquiry,” Hyster, 2 F.3d at 235, because, in determining that the grieving employee was not cov *149 ered by the collective bargaining agreement, the court was necessarily determining that the employee was not entitled to relief under that agreement. For example, in Hyster the Seventh Circuit Court reasoned that three questions — “whether the Union has standing to file a grievance on behalf of retired employees, whether the grievance is arbitrable, and whether the grievance has merit — all collapse[d] into the same inquiry: whether the collective bargaining agreement covers retired employees.” 2 F.3d at 235.
The GKN Aerospace and Hyster Courts were thus presented with the threshold issue of whether the individuals attempting to arbitrate a grievance under the collective bargaining agreement’s grievance procedure were authorized to do so — or, using the language of E.M. Diagnostic, whether the interests these individuals sought to enforce came within the “zone of interests” protected under the agreement. This issue went directly to the jurisdiction of the arbitrator to hear the grievance in the first place. Cf. Terre Haute Newspaper Guild, Local No. 46 v. Thomson Newspapers, Inc., 68 F.Supp.2d 1028, 1033, 1037 (S.D.Ind.1999) (discussing Litton and Hyster, and reasoning that “it is the Court’s responsibility to determine whether the ... employees may be covered [under the collective bargaining agreement] before it can send the question to the arbitrator”). Stated another way, these Courts believed they were required to determine, as a threshold matter, whether the employees were authorized to bring grievances under the respective collective bargaining agreement regardless of whether, had they been so authorized, those grievances would have been meritorious.
In our case, the merits of the Union’s grievances and the issue of arbitrability are not “intertwined” in a similar sense: it is undisputed that the CBA remains in force and that the Union is authorized to bring grievances under it. At bottom, the Majority’s conclusion that the merits and the issue of arbitrability are “inextricably intertwined” reduces to the conclusion that the Union’s grievances do not actually “involve the interpretation” of the CBA because they are not meritorious. As I have explained, the Steelworkers principles prohibit this line of inquiry, and I cannot discern from Litton any intention on the part of the Supreme Court to jettison those principles in all contexts.[21]

B. The Union’s Dispute Is Not Expressly Excluded From Arbitration, And There Is No “Forceful Evidence’’ Of An Intention To The Contrary

Because the Union’s grievances come within the scope of the CBA’s arbitration provision, I conclude that we are required to compel arbitration. It is undisputed that the CBA’s arbitration provision is broad, and that the presumption of arbitrability applies. Accordingly, the Union’s dispute is arbitrable unless (1) the CBA contains an “express provision excluding it” from arbitration, or (2) Rite Aid (the party opposing arbitration) produces “the most forceful evidence” to this effect from the bargaining history. AT & T Techs., *150 475 U.S. at 650, 106 S.Ct. 1415 (quoting Warrior & Gulf, 363 U.S. at 584-85, 80 S.Ct. 1347).
Neither is true here: (1) the CBA contains no arbitration exclusion for disputes over the circumstances in which Union representatives may enter Rite Aid stores,[22] and (2) Rite Aid has submitted no “forceful evidence” from the parties’ bargaining history suggesting an intention to exclude such disputes from arbitration.[23] Thus, we must order the parties to arbitrate the grievances even if the Union’s interpretations of the Recognition, Observation, and/or Privileges Provisions are “frivolous,” as engaging in a substantive interpretation of these provisions would involve an impermissible review of the merits.[24]
* * * * * *
“Decisions on the merits, whether easy or difficult, must be left to the arbitrator.” E.M. Diagnostic, 812 F.2d at 97. The Majority essentially concludes that the merits question of whether the Union has a right of store access to solicit membership is so “easy” to answer that arbitration is not called for. Although the Majority reaches this conclusion under the guise of enforcing the parties’ agreement to arbitrate only those disputes that “involve the interpretation” of the CBA, it conflates that question with whether the Union’s interpretation of the CBA is correct. In my view, such analysis veers impermissi *151 bly into the merits of the underlying grievances, and fails to heed the Supreme Court’s warning that courts not “become entangled in the construction of the substantive provisions of a labor agreement, even through the back door of interpreting the arbitration clause.” Warrior & Gulf, 363 U.S. at 585, 80 S.Ct. 1347.
I fear the Majority’s holding will significantly undercut the force of the presumption of arbitrability in cases involving similar arbitration provisions. In such cases, courts in our Circuit will presumably conclude that they may examine the merits of every grievance and, upon determining that the arbitration proponent’s interpretation of the bargaining agreement is not sufficiently “plausible,” refuse to compel arbitration. I do not believe the Steelivorkers Courts envisioned such a screening role for courts, nor do I believe the Litton Court intended to announce an exception to the presumption of arbitrability that would effectively swallow the presumption itself.
For these reasons, I respectfully dissent.

. Like the Majority, I refer to the parties’ collective bargaining agreements as a single "CBA.” Maj. Op. at 130 n. 1.

. I note that at least two other courts have rejected Rite Aid's attempts to bypass arbitration of similar disputes. See Rite Aid of N.Y., Inc. v. United Food and Commercial Workers Int’l Union Local One, No. 07-cv-708, 2009 WL 185764 (W.D.N.Y. Jan.23, 2009); 1199 SEIU, United Healthcare Workers East v. Rite Aid Corp., No. 07-cv-4816, 2008 WL 762090 (S.D.N.Y. Mar.24, 2008).

. The Union submitted the declaration of Executive Vice President Farina, in which he averred that: (1) prior to the current dispute, he was "not aware that Rite Aid had a [n] on-solicitation policy at any of its retail stores” within the counties covered by the CBA; and (2) Rite Aid "had, for decades, permitted [Union] representatives ... to have access to both newly acquired and newly opened Rite Aid stores within the geographic jurisdiction of [the] CBA[ ], for the purpose of soliciting Rite Aid's employees for membership in [the Union].” Rite Aid submitted the declaration of Human Resources Manager Mark Firment — • who has been employed by Rite Aid since February 2000 — in which he averred that, "[t]o the best of [his] knowledge, information and belief, Rite Aid's [n]on-solicitation [policy has been and continues to be consistently enforced throughout all of Rite Aid's stores, including, but not limited, to [the six Brooks Eckerd stores that Union members attempted to enter].” Mr. Firment's declaration did not address whether the policy has ever been applied to Union representatives seeking to enter Rite Aid stores to solicit membership.

. The collective bargaining agreement at issue in E.M. Diagnostic provided for arbitration of "[a]ny dispute arising out of a claimed *141 violation of [the collective bargaining agreement].” Id. at 92.

. The Majority dismisses the relevance of the Kroger decisions, reasoning that any "ambiguity in Kroger ... does not translate to ambiguity in the instant CBA.” Maj. Op. at 133. I *144 believe my colleagues misperceive the Union’s argument: it is not that Kroger II is ambiguous, but that it results in ambiguity in the CBA. Because Rite Aid has waived its right to require the Union to show majority support through an NLRB election, it must accept some alternative means by which the Union can make that showing. It is entirely possible that the parties resolved this issue by adopting a practice — even if it not explicitly memorialized in the CBA — of allowing Union representatives to enter Rite Aid stores for such purposes; i.e., entering newly acquired stores to distribute authorization cards.

. The docket number and the parties' names were redacted from the arbitrator’s written opinion. Although not themselves in the record on appeal, in her opinion the arbitrator cited five additional arbitration decisions that apparently reached the same result. Id. at *23-24.

. The Majority seeks to distinguish this decision on the ground that the collective bargaining agreement at issue in Albertson s, unlike the Rite Aid CBA, included "a provision specifically providing for the applicability of the CBA to new stores.” Maj. Op. at 11. However, the NLRB has ruled that the effect of a recognition provision worded similarly to the Rite Aid Recognition Provision is the same — it "purports] to add after-acquired stores to the existing [bargaining] units.” Kroger I, 208 N.L.R.B. at 929 (considering recognition provision that provided that "[t]he Union shall be the sole and exclusive bargaining agent for all employees employed by the [employer] in stores operating in the state of Texas”). Hence, the differently worded recognition provision in Albertsons is not a basis for distinguishing that decision.

.The Majority finds it "rather curious” that the Union has “urg[ed] us to consider favorable ... merits decisions as evidence of the dispute’s arbitrability,” given that the "merits and arbitrability questions are distinct.” Maj. Op. at 133 n. 5. In light of the District *145 Court's and the Majority’s conclusion that the merits and the question of arbitrability are "inextricably intertwined” in this case, I see nothing curious about the Union’s submission of these decisions.

. Further supporting this conclusion is the fact that the CBA expressly provides that Union representatives may enter Rite Aid stores for at least one purpose: the Observation Provision authorizes Union representatives to enter Rite Aid stores "to satisfy themselves that [the CBA] is being observed.” Regardless of the merits of the Union’s position that this provision should be interpreted as authorizing it to enter newly acquired stores to solicit membership, the Observation Clause confirms that the subject matter of the Union's grievances — i.e., the circumstances in which Union representatives may enter Rite Aid stores — falls within the "zone of interests” that have received protection in the CBA. The Majority, like the District Court, concludes that the Observation Provision is irrelevant to the Union's grievances, as “[t]he CBA cannot apply to the newly-acquired stores or to their employees because the Union does not presently represent those stores' employees.” Maj. Op. at 134. Of course, the Majority’s conclusion only makes sense in light of Kroger II; when read literally, the Recognition Provision purports to do exactly that (i.e., make the Union automatically the bargaining agent for employees in newly acquired stores). Thus, although the Majority concludes that the Recognition Provision is not ambiguous (in rejecting the Union’s interpretation of that provision), it nonetheless relies on the ambiguity in the Recognition Provision that results from Kroger II in rejecting the Union’s interpretation of the Observation Provision.

. Because the Recognition Provision sufficiently demonstrates that the Union’s grievances come within the "scope” of the CBA's arbitration provision, I need not address the Union's argument regarding the Privileges Provision. I note, however, that our decision in United Steelworkers of America v. Rohm and Haas Co., 522 F.3d 324 (3d Cir.2008) — on which Rite Aid relies almost exclusively in its brief — does not, as the Majority contends, broadly authorize courts to interpret substantive provisions of a collective bargaining agreement to determine whether they are “sufficiently implicated by a grievance that one party seeks to arbitrate.” Maj. Op. at 135.
The collective bargaining agreement in Rohm and Haas contained an arbitration provision that, unlike the Rite Aid CBA’s arbitration provision, applied only to specific subjects — i.e., "[sjuch questions arising under [the] Agreement as involve wages ..., individual base rates, hours of employment and working conditions.” 522 F.3d at 328 (first alteration in original). After their claims for disability benefits under the parties’ ERISA plan (which lacked an arbitration provision) were denied by the plan administrator, union employees sought to arbitrate those claims under the parties’ collective bargaining agreement. In light of the arbitration provision’s express subject matter limitations, we reasoned that, "[although ... the ... arbitration clause [was] broad, the underlying basis for the [union’s] grievance ... must still arise from some specific article” of the collective bargaining agreement. Id. at 332. Accordingly, we considered substantive provisions of the collective bargaining agreement to determine whether, as the union argued, "disability benefits are considered 'working conditions' [under the collective bargaining agreement],” and thus “within the range of arbitrable subject matter.” Id. We concluded the answer was clearly no.
The Majority suggests that I dismiss Rohm and Haas (on which I was on the panel that decided it) without explaining why "we should not be bound by this very recent binding precedent.” Maj. Op. at 135 n. 7. I do not question the binding nature of Rohm and Haas, but conclude that it is simply not on point. In Rohm and Haas, it was obvious that the subject matter of the union’s grievances — entitlement to disability benefits under a completely separate ERISA plan — fell wholly outside the scope of the collective bargaining agreement. ERISA benefits on their face simply are not “working conditions.” To be sure of this, we considered the union's arguments that certain provisions of the bargaining agreement could be construed as referring to or incorporating the disability benefits provided for under the ERISA plan. In so doing, however, we did not broadly hold that "the merits may be considered when necessaiy to determine arbitrability.” Id. Indeed, we had no reason to consider the merits of whether the employees were entitled to disability benefits under the ERISA plan, and did not, as the Majority does, rely on Litton Financial Printing Division v. National Labor Relations Board, 501 U.S. 190, 111 S.Ct. 2215, 115 L.Ed.2d 177 (1991), to justify our analysis. Accordingly, I cannot agree that Rohm and Haas is the watershed decision my colleagues apparently believe it is.

. The arbitration provision in the expired collective bargaining agreement at issue in *148 Litton provided: "Differences that may arise between the parties hereto regarding this Agreement and any alleged violations of the Agreement, [and] the construction to be placed on any clause or clauses of the Agreement[,] shall be determined by arbitration. ...” Id. at 194, 111 S.Ct. 2215.

. Although cited by the Majority, the First Circuit Court’s decision in Peerless Pressed Metal Corporation v. International Union of Electrical, Radio and Machine Workers, 451 F.2d 19 (1st Cir.1971) — issued two decades before the Supreme Court's decision in Litton — does not support the Majority’s analysis. Indeed, in concluding that grievances lodged by a supervisor were arbitrable — even though the argument that supervisors were covered under the collective bargaining agreement was "weak” (but not "impossible”), id. at 21 — Peerless cautioned that courts may not "inquire into the merits on the theory that they are enforcing a clause limiting arbitration to disputes requiring an interpretation of the agreement.” Id. at 20.

. The Majority's reliance on Litton is ironic, given the lengths our Court has gone to avoid reaching the merits even in the context of grievances arising under expired collective bargaining agreements. See Luden’s Inc. v. Local Union No. 6 of the Bakery Workers' Int’l Union of Am., 28 F.3d 347, 354 (3d Cir.1994) (declining to answer whether Litton "impliedly overruled the portion of Nolde holding that a court answering the arbitrability question is not to look to the merits of the underlying claim,'' and instead holding that the duty to arbitrate arose as a term of an implied-in-fact collective bargaining agreement after the prior agreement had lapsed).

. The CBA expressly excludes only one topic from the grievance procedure: an alleged breach of the no~strike clause.

. The Majority appears to suggest that such "forceful evidence" exists because the CBA includes other provisions addressing new stores — i.e., a provision recognizing Rite Aid's right to "open new establishments of any kind,” and requiring Rite Aid to "notify the Union of any new store openings or acquisitions within” the counties covered by the CBA. Because these provisions confirm that the parties bargained with respect to Rite Aid’s right to open new stores, the Majority concludes that "[i]f the parties had intended a right of access to be encompassed by the CBA’s arbitration clause, it surely would have appeared in the CBA.” Maj. Op. at 136 n. 8.
This observation might be relevant to the merits of the Union’s underlying grievances, but it reveals nothing about the parties’ intent to exclude from arbitration disputes over the circumstances in which Union representatives may enter new Rite Aid stores. Indeed, we rejected a similar argument in E.M. Diagnostic, where the employer argued that the union’s subcontracting grievance was not arbitrable based on evidence from the bargaining history that (1) although “the Union sought to negotiate a specific limitation on the Company's right to subcontract work,” the executed bargaining agreement contained no such provision, and (2) a union representative had acknowledged the employer’s unfettered right to subcontract during negotiations. 812 F.2d at 97 ("However relevant [those facts] might be to the merits of the Company's case on the subcontracting issue, it does not enlighten us on whether the parties agreed to limit the arbitration clause of the agreement to less than its apparent scope.”); accord Lukens Steel Co. v. United Steelworlcers of Am., 989 F.2d 668, 674 (3d Cir.1993) (grievance regarding the timing of recall of employees following a strike was arbitrable, despite evidence from the parties' bargaining history that the timing issue was “left outside the contract [subject] to [the employer's] unilateral determination,” because "even if the parties agreed that [the employer] had the right to set the timing of the recall, it would not necessarily follow that disputes over the timing of the recall were not arbitrable”).

.The Majority suggests that the CBA’s arbitration provision itself constitutes "forceful evidence” that the parties "intended to exclude from arbitration claims which arise wholly outside the scope of the CBA.” Maj. Op. at 136. I do not believe such a conclusion follows under the Steelworkers principles' — i.e., those principles do not contemplate that a court may substitute its own interpretations of substantive provisions of a bargaining agreement for "forceful evidence” from the bargaining history of an intention to exclude a dispute from arbitration.